IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PAUL ALOIS ADAMSKI,

                        Plaintiff,

      v.

COREY HEATH, BRANDON
DROST, MARIO CANZIANI,
CLAIRE HICKEY-WILBUR,
CHRIS BUESGEN, KEVIN CARR,
JAMISON KUBALA, and JEFFREY
MOORE,

                   Defendants.

OPINION AND ORDER

21-cv-215-wmc

---

*Pro se* plaintiff Paul Alois Adamski contends that he received a false conduct report and was removed from the Veteran's Unit at Stanley Correctional Institution in violation of federal and state law for filing numerous inmate complaints. Adamski also filed a motion to admit other acts evidence and a motion for spoliation sanctions. (Dkt. ##18, 22.) In turn, defendants have moved for summary judgment on all of Adamski's claims. (Dkt. #48.) With his brief in opposition to summary judgment, Adamski further filed a motion to strike portions of certain defendants' declarations. (Dkt. #68.) For the following reasons, the court will now grant defendants' motion for summary judgment and dismiss this case.

PRELIMINARY MATTERS

At the outset, the court will address plaintiff's motion to strike and his motion to

admit other acts evidence before turning to the evidence presented at summary judgment.[1]

## I.  Motion to Strike (Dkt. #68)

Plaintiff seeks to strike the following paragraphs from the declarations of defendants

Corey Heath, Brandon Drost, and Mario Canziani:

- Paragraph 12 of Heath's declaration:  Heath, a correctional officer, attests that she felt "stalked" by Adamski on several occasions while working on the Veteran's Unit, that many inmates had told her that Adamski was keeping notes in his cell about her movements, and that she had noticed Adamski and another inmate often staring at her.  (Dkt. #55 at 4.)  Adamski argues that these assertions are not based on Heath's firsthand knowledge and there is no documentary evidence of the alleged notetaking.

- Paragraph 9 of Canziani's declaration:  Canziani, the deputy warden, attests that Adamski was moved off his unit in the interest of institution security, inmate rehabilitative needs, and staff and inmate safety.  (Dkt. #54 at 3.)  Canziani recalls that Adamski seemed to be targeting Heath and that other inmates were complaining about him.  Adamski argues lack of foundation and that these assertions are not based on Canziani's personal knowledge.

- Paragraph 8 of Drost's declaration:  Drost, the unit manager, attests that several inmates had complained to him about Adamski, that Adamski was "toxic" and "had it out for staff members," and that Adamski and two other inmates were writing internal correspondence targeting staff members including Heath because Adamski wanted Heath fired.  (Dkt. #53 at 2-3.)  Adamski argues that these assertions are not based on Drost's personal knowledge and that the word "toxic" is not defined.

- Paragraphs 10 and 11 of Drost's declaration: Drost attests that Adamski had a "negative and toxic attitude" (dkt. #53 at 4), which Adamski argues is not based on any personal interaction Drost had with him.  Drost also attests that there were staff members who refused to work on Adamski's unit or to

---

[1] This lawsuit was originally assigned to the Honorable Barbara B. Crabb, then transferred to me on October 6, 2022.   Judge Crabb had initially deferred ruling on the other acts and spoliation motions, stating that the court "will address those only if it becomes necessary to do so at summary judgment or trial."  (Dkt. #41 at 1.)  Although it is necessary to address the other acts motion at summary judgment, the court finds the spoilation motion to be moot for reasons addressed later in this opinion.

search his cell to avoid interacting with him, and that Adamski's own social worker "routinely" asked Drost to remove Adamski from his unit. (*Id.* at 5.) Adamski argues that these assertions are not based on personal knowledge and that Drost does not include any names or supporting documentation.

A motion to strike often amounts to a make-work exercise, and this motion is no exception. Adamski's arguments, and his parallel objections to defendants' proposed findings of fact based on these assertions, have no basis. Each of these defendants have personal knowledge of: what they observed; their own decision-making; what other people have told them; and how that information made them feel or influenced their decision-making. Whether that information has any evidentiary value depends on the purpose for which it is being offered, and at summary judgment, on what a reasonable jury could find when viewing the evidence in a light most favorable to Adamski. For example, Heath reasonably could have believed what she had heard about Adamski's note-taking, even without seeing actual notes, based on her own observations of him watching her and because she heard other allegations from staff and inmates alike. Of course, what she was only told by others could not be offered for the truth of the matter if only asserted by others, unless subject to a hearsay exception under Federal Rule of Evidence 804. Similarly, Canziani and Drost can attest to what was in *their* own mind when making the decision to remove Adamski from his unit. As for Drost's characterization of Adamski as "toxic" or having a negative attitude, he attests that is based on complaints by others about Adamski's conduct and attitude, and what he means is clear from the nature of the complaints made that he includes in his declaration -- someone who targets staff, pressures others to do so, and thus contributes to a negative climate in the unit.

Of course, these defendants may not have the personal knowledge necessary to

3

prove many of the underlying allegations about Adamski, but they can attest to the impact certain information had on them.  Accordingly, while the court will deny his motion to strike, it will take note below of the information and allegations Adamski disputes.

## II. Motion to Admit Other Acts Evidence (Dkt. #22)

The court will also deny in part plaintiff's motion to admit "other acts" evidence concerning three, non-party inmates' experiences with defendant Heath.  Specifically, one inmate attests that Heath fraternized with certain inmates on his unit and wrote a false conduct report about him in retaliation for other inmates' having harassed Heath's mother, who also worked at Stanley.  (Dkt. #25.)  Another inmate attests that Heath behaved unprofessionally on his unit by "actively seeking to fraternize," giving preferential treatment to some inmates, and calling for meals so quietly that people could not hear her, then being hostile to those inmates who kept their cell doors open to hear her call for meals. (Dkt. #26.)  Plaintiff argues that these accounts show "the environment [that Heath] created when she worked on a [unit]," that she fraternized with certain inmates, and that she knew "how to use a conduct report to take revenge."  (Dkt. #22 at 7-8.)

Plaintiff's rationale for admitting this evidence is relevant to the extent that a propensity inference is drawn:  Heath treated some inmates in other units poorly before, and wrote false conduct reports about them, and did the same here.  The court will not consider this evidence at summary judgement because evidence of actions toward others cannot be offered merely to show a person's propensity for acting in a certain way against plaintiff.  *See United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (admission of other acts evidence must be "supported by some propensity-free chain of reasoning").

Plaintiff also seeks to admit evidence concerning an inmate who lived in the Veteran's Unit during the period relevant to this case and was removed several months before plaintiff. This inmate attests that Heath pressed to have him removed because he complained about her fraternizing with two other inmates. (Dkt. #24.) In addition to this inmate's sworn attestations, plaintiff submitted the inmate's letter to defendant Canziani and his inmate complaint about the removal, as well as several emails from defendants Drost and Heath discussing plaintiff and this other inmate, apparently to show that Heath felt she was being targeted by both. Plaintiff resubmits one of these emails with his summary judgment materials specifically to argue that his and the other inmate's experiences are intertwined, and this evidence demonstrates Heath's "motive to retaliate and slander," as well as her anger at having "her misconduct reported to her superiors." (Dkt. #22 at 6.)

Defendants do not object "to the portions of [these] emails being admitted to the extent they involve only Adamski" (dkt. #30 at 10), so the court will consider this evidence as it pertains to plaintiff. The court will also consider these emails as proof of Heath's state of mind while working on the Veteran's Unit with plaintiff, not to draw any inference of her propensity to act in a certain way. Thus, to this extent, the court will grant plaintiff's motion in part. Having determined the scope of the evidence before it, the court turns to the facts.

UNDISPUTED FACTS[2]

Plaintiff Adamski is a U.S. Navy veteran, although this lawsuit concerns events that occurred while he was incarcerated at Stanley Correctional Institution ("Stanley"). The named defendants are Wisconsin Department of Corrections Secretary Kevin Carr, Stanley Warden Christopher Buesgen, Deputy Warden Mario Canziani, Security Director Jeffery Moore, Corrections Program Manager Brandon Drost, Supervising Officer Jamison Kubala, Correctional Officer Corey Heath, and Institution Complaint Examiner ("ICE") Claire Hickey-Wilbur.

## A. Adamski's Adjustment to the Veteran's Unit at Stanley

There is a separate housing unit at Stanley for military veterans called the "Veteran's Unit" or "Veteran's Wing," which offers additional services and strives to provide a supportive living environment for veterans, who may face additional challenges from the rest of the inmate population as a result of their service. Because living on this unit is a privilege, it has its own handbook, and unit inmates are held to higher standards and expectations regarding their behavior, productivity, and participation in treatment and other programming.

Drost is the Veteran Unit's manager. Inmates who want to live in the unit must apply to the unit social worker. Admittance is decided based on an inmate's conduct, attitude, institution job placement, and community.

---

[2] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying record as appropriate.

Adamski lived in the Veteran's Unit from May 2019 until December 2020, having applied and been accepted because he wanted "a quieter, more respectful environment" and to bond with "others with similar life experiences."  (Dkt. #64 at 4.)  While in the unit, Adamski received positive work evaluations, founded a sober support group, wrote articles for the unit's newsletter, and coordinated a unit donation to the Wounded Warrior Project.  One former unit mate describes Adamski as a "very helpful influence for the entire wing" who wanted "the best" for the unit.  (Dkt. #72.)

However, Adamski also "noticed several problems with the Vet[eran's] Wing environment," including what he perceived to be an "abuse of authority" by Drost, unaddressed racism, and frequent staff misconduct targeting veteran inmates.  (Dkt. #64 at 4.)  As a result, Adamski filed 22 inmate complaints during his 19 months in the unit. Several concerned Correctional Officer Heath, with whom Adamski found it "difficult . . . to work."  (*Id.* at 7.)  For example, Adamski complained that Heath had shot the laser of a barcode scanner into his eyes.  He also complained that Heath had put sticky notes on the doors of sick people and left paperwork on the edge of a desk during a norovirus outbreak, in violation of HIPAA, and Adamski told the inmates he believed had been affected.  Adamski also complained about a quote Heath had written on a white board after discussing the quote with several other inmates.  In addition to inmate complaints, Adamski wrote a letter to a state senator complaining of racism and inmate mistreatment, and "tried to get others on board with denouncing this sort of activity."  (*Id.* at 6.)  Adamski viewed these actions to be part of his "civic duty to report . . . misconduct," and further, that he will inform other inmates of staff misconduct that he believes affects them.  (*Id.* at

1.)

Veteran's Unit Manager Drost attests that it became apparent to him that Adamski was "not a good fit" for the unit. (Dkt. #53 at 6.) In particular, soon after Adamski arrived on the unit, Drost received complaints from several inmates about Adamski "interfering with the unit's supportive climate and atmosphere." (*Id.* at 2-3.) Three inmates also purportedly wrote letters to Drost in July 2020 accusing Adamski and two other inmates of targeting unit staff, including Officer Heath, if they did not get what they wanted, as well as writing complaints while pressuring other inmates to join them. (Dkt. #53-4.) Drost was particularly troubled by this latter conduct because "[a] group of inmates rallying together over a cause creates a major security concern," and it can lead to "a dangerous hierarchy amongst inmates." (Dkt. #53 at 4.)

In addition to inmate complaints, Drost attests that several staff members refused to work on the Veteran's Unit or even to search Adamski's cell when it was chosen for a random search to avoid interacting with him. Similarly, he represents that Adamski's social worker "routinely" asked Drost to move Adamski off the unit "because of his bad attitude." (*Id.* at 4-5.)

While Adamski disputes that he behaved inappropriately or otherwise contributed to a negative unit atmosphere, Drost also attests that supervisory staff frequently discussed Adamski's possible removal from the unit because of "his negative and antagonistic attitude, disrespect towards staff, and propensity to meddle in other inmates' business." (*Id.* at 5.) As for Adamski's use of the inmate complaint review system, Drost viewed this to be "an appropriate avenue for an inmate to raise concerns," and further attests that no

8

staff member was ever disciplined based on Adamski's complaints. (*Id.* at 7.) Finally, despite their initial concerns about Adamski's adjustment to the unit, Drost attests that supervisory staff "opted to give him some more time . . . in the hopes that his adjustment would improve." (*Id.* at 5.)

**B.   The Work-Related Conduct Report**

While living in the Veteran's Unit, Adamski worked as a Laundry Worker responsible for bringing the laundry carts to the main laundry area in the unit each morning.  Unit staff knew it was time to direct workers to go to the main laundry area when a call from the laundry officer would come over staff walkie-talkies.  Adamski's position description states that laundry workers should go "as directed by staff," and that "[r]esponsibility for job duties may change and can be assigned as directed, anytime by staff." (Dkt. #56-3.)

At his deposition, however, Adamski testified that a unit officer in the Veteran's Unit who would typically allow the laundry workers to leave at around 6:55 a.m. without waiting for an instruction to go.  Nevertheless, consistent with general policy, a correctional officer advised Adamski one morning that he could be fired if he left the unit before unit staff specifically told him to do so.  When Adamski sought clarification from the laundry department, he was further told to do what staff told him to do.  Yet, after Adamski did not timely deliver the laundry one morning because the unit officer never expressly told him to leave, Adamski testified that Sergeant Peterlik verbally instructed him to always deliver the laundry by "7:01 at the latest." (Dkt. #47 at 69:11-12.)

Next, Officer Heath was at the Veteran's Unit officer's station on September 16,

2020 and saw Adamski sign out to take the laundry cart up to the laundry building just before 6:55 a.m., and in particular, before the laundry officer had called for the laundry. Adamski testified that Heath then asked him where he was going, and further told him that he could not leave until Heath said he could.  (*Id.* at 74:6-16.)  Adamski responded that he had a verbal order from Sergeant Peterlik to get the laundry to the laundry building by 7:01 a.m. at the latest, as well as a written order from laundry to obey his unit staff, and that he could get a ticket for disobeying Peterlik's order.  (*Id.* at 74:17-25, 81:13-82:12.)  Officer Heath replied that she knew nothing about such an order, and as far as she knew, the rule was that laundry workers could not leave the unit without the on-duty officer's permission.  (*Id.* at 75:2-5.)  Moreover, when Heath told Adamski that she would check with Sergeant Peterlik and Unit Manager Drost, Adamski pointed out that Peterlik was Heath's boss, and questioned why Heath was "trying to counterman [her] boss's directive" and "going to go over [her] boss's head" to the Unit Manager.  (*Id.* at 75:22-76:11.)  After Adamski again told Heath that he had to go (*id.* at 76:12-17), and Heath repeated that she was going to check with Peterlik, Adamski replied that he had to leave and walked away without Heath telling him that he could leave and without hearing the laundry call come through before he left.  (*Id.* at 76:18-77:17.)

Not surprisingly, the parties dispute certain aspects of this exchange, with Officer Heath attesting that:  she specifically instructed Adamski to "wait seated" until the call for laundry was received; Adamski then said he had both a verbal and written order that he could leave early for the laundry; and when Heath again told Adamski to wait while she confirmed his statements, he just left.  (Dkt. #55 at 2.)  On the other hand, Adamski does

not recall being told to wait, and he disputes that he characterized his written response from the laundry department as "permission to leave at a certain time," although he admits that Heath and he were wearing masks, making it hard to hear each other.[3]  (Dkt. #47 at 79:2-9.)

Regardless, there is no dispute that at 7:07 a.m., Officer Heath emailed Sergeant Peterlik, Unit Manager Drost, and the laundry department officer about her exchange with Adamski, noting that the call for laundry "happened at 0655," other workers have to wait for the laundry call, and leaving at 6:55 a.m. "allows [Adamski] more than enough time to get up there like everyone else."  (Dkt. #55-1 at 2.)  Sergeant Peterlik responded that he had told Adamski "to be up there at 7:02," but "it shouldn't take 7 minutes to do [that], [Adamski] shouldn't be leaving before 0655," especially since "[t]he call is usually at 0655."  (*Id.* at 1.)  Similarly, the laundry department officer responded that he had told Adamski "that it was up to the unit officer when he can leave," and "that I call on the radio every day at about 6:55 to send up the laundry."  (*Id.*)  When Heath later asked Adamski for proof of the written order he had referenced, Adamski provided a copy of an information request instructing that it was up to his unit officer to decide when he could leave with the laundry and advising that while some officers allow workers to leave every day at a set time, others make workers wait until the call comes over the radio.

---

[3] Before summary judgment, Adamski filed a motion for spoliation sanctions alleging that video of this incident was not preserved.  (Dkt. #18.)  The motion will be denied.  As an initial matter, Adamski's claims are not proceeding to trial, so his request for an adverse jury instruction is moot. Regardless, the video would not have had audio, and thus would not resolved none of the parties' disputes about what Heath or Adamski said to each other.  Although the video may have shown *when* Adamski actually left the unit for the laundry department, that is not a material dispute for reasons discussed below.

Concluding from the email responses and the information request that Adamski did not have an order allowing him to leave early or before directed by unit staff, Officer Heath then issued a minor conduct report, charging Adamski with disobeying orders, lying, and inadequate work performance.  (Dkt. #54-1.)  Officer Heath also mentioned to Unit Manager Drost that she was going to issue the conduct report.  Adamski contested the conduct report in a written statement, claiming that he did not recall Officer Heath telling him to wait, and explaining that he left because he thought Heath would just confirm his statements anyway.  On review, however, Supervising Officer Jamison Kubala found Adamski guilty of all three charges and ordered five days loss of dayroom.

Adamski further appealed Kubala's ruling, arguing that Peterlik had given him an order to leave, so that he could be at the laundry by 7:00, and thus, he did not need the unit officer's permission.  He also claimed that the conduct report was retaliation by Officer Heath for his earlier inmate complaints.  Finally, Deputy Warden Canziani affirmed Kubala's decision after determining that he had followed proper procedures, appropriately considered the evidence, and issued a disposition proportional to the charges against Adamski.  Having been found guilty of the charges, Adamski lost his laundry worker job.

On November 30, 2020, Adamski submitted an inmate complaint claiming that newly discovered evidence showed that Officer Heath had made a false and misleading statement in the conduct report.  (Dkt. #52-2.)  Adamski claimed that the email chain between Heath, the laundry department officer, and Sergeant Peterlik, and specifically Peterlik's statement about when he told Adamski to be at the laundry department, should have exonerated him, since video evidence would show that he did not actually leave the

unit until after 6:55 a.m. and, therefore, did not leave early.  (*Id.* at 10.)  However, Inmate Complaint Examiner Claire Hickey-Wilbur reviewed the complaint and recommended its dismissal, noting that:  the new evidence had not been submitted to her; and regardless, Adamski had already exhausted his administrative remedies concerning the conduct report process.  Hickey-Wilbur advised Adamski that he could submit a Warden-initiated review of the conduct report, but Warden Buesgen and nondefendant Cindy O'Donnell both adopted Hickey-Wilbur's recommendation.

### C. Adamski's Removal from the Veteran's Unit

Veteran's Unit Manager Drost, Deputy Warden Canziani and Security Director Moore next decided on December 21, 2020, to remove Adamski from that unit and to transfer him to Unit 4.  That same day, Adamski had submitted an inmate complaint about Officer Heath.

By way of background, five months earlier, in July 2020, Officer Heath had sent Unit Manager Drost an email noting that she had been told by several inmates that Adamski and another inmate had "targeted" her and were trying to get her fired.  (Dkt. #24-5 at 2.)  Heath specifically asked whether something could be done because she had done nothing wrong and would not "tolerate people trying to get [her] fired for doing her job."  (*Id.*)  Drost responded that he was not sure, and remarked that Adamski and this other inmate "are out to get any staff member they can."  (*Id.* at 1.)  On August 9, 2020, Officer Heath next wrote a short email to Drost and Peterlik noting that Adamski and another inmate were causing "a climate issue" with their "conscious continuous negative actions/contributions" and asking why it was so hard to remove someone from the unit for

13

that reason.   (Dkt. #24-8.)   On August 17, Officer Heath also sent an email to Unit Manager Drost expressing concern for her safety after several inmates and unit staff had purportedly told her that Adamski was keeping notes in his cell of Heath's actions, and she had observed him staring at her.  (Dkt. #64-36 at 1.)  Heath also now attests that she had "considered looking for a new post because [Adamski's] harassment towards her had become unbearable."  (Dkt. #55 at 4.)

In addition, Veteran's Unit Manager Drost attests that Adamski was removed from the unit "due to safety and security concerns surrounding his attitude, demeanor and interactions with staff and other inmates on the unit." (Dkt. #53 at 6.)  Specifically, Drost had not observed Adamski trying "to improve his negative attitude, and it was apparent that he was not a good fit for the Veteran's Unit due to his hostility towards certain staff members and his continuous meddling in other inmates' business."  (*Id.*)  Manager Drost also did not believe that Adamski was living up to the higher standards of behavior expected of inmates in the Veteran's Unit despite time to adjust.

Deputy Warden Canziani similarly attests that Adamski was removed in the interest of institution security, inmate rehabilitative needs, and staff and inmate safety. Specifically, Canziani recalled that Adamski "seemed to be targeting Officer Heath and creating a significant climate issue on the Veteran's Unit," to the point where other inmates were complaining about him.  (Dkt. #54 at 3.)  For Canziani, not being able to get along with others on the unit and follow institution rules, not maintaining good behavior, and not maintaining a job are *all* reasons why an inmate could lose the privilege of living in the Veteran's Unit.  Moreover, because "Adamski was clearly having some adjustment issues

14

and negative interactions" in the Veteran's Unit, Canziani reasoned that "it could be beneficial for him to move to a new housing unit" where he would be surrounded by different staff and inmates.  (*Id.* at 4.)

After he was removed, Adamski wrote a letter to Canziani claiming that his removal was in retaliation for filing of inmate complaints.  Adamski also filed an inmate complaint alleging retaliatory removal, but ICE Hickey-Wilbur recommended dismissal.  Buesgen and nondefendant O'Donnell adopted that recommendation and dismissed the complaint.  Even so, Adamski disputes that he contributed to a climate or safety problem in the Veteran's Unit.  In particular, he denies that keeping notes about or staring at Officer Heath, acting outside of unit rules, or making any unfounded allegations about staff.

OPINION

A party moving for summary judgment must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If this burden is met, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Here, the court granted plaintiff leave to proceed on claims that:  (1) defendant Heath retaliated against him, defamed him and acted negligently by issuing him a false conduct report;  (2) defendants Drost, Canziani, Hickey-Wilbur, Buesgen, Carr, Kubala and Moore retaliated against him and acted negligently by failing to overturn that report despite knowing it was false;  and (3) those same defendants further retaliated against him

15

by removing him from the Veteran's Unit.  Defendants seeks summary judgment on the merits of all plaintiff's claims.[4]

## I.   Federal Retaliation Claims

A retaliation claim is easy to plead but is often difficult to prove, since plaintiff must show that:   (1) he was engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take retaliatory action.  *McGreal v. Village of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).   Moreover, a defendant cannot be found liable for retaliation where he can show that the claimed deprivation would have occurred even if the alleged retaliatory motive did not exist.  *See Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) (quoting *Green v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011)) (a defendant is not liable for retaliation where he can show "that his conduct was not a necessary condition of the harm—the harm would have occurred anyway"); *see also Brown v. Phillips*, 801 F.3d 849, 855 (7th Cir. 2015) ("it is irrelevant if [a prison employee] may have had a retaliatory motive" if the defendant's conduct "is supported by a legitimate reason").

### A.   Lack of Personal Involvement

To begin, the court must dismiss plaintiff's retaliation claims against certain

---

[4] Heath, Kubala and Canziani alternatively argue that they are entitled to qualified immunity for their limited involvement in the issuance of the conduct report.  Because the court will dismiss plaintiff's constitutional claims on their merits, the court need not reach that alternative argument.

16

defendants because they lacked sufficient involvement in the events alleged here.  A plaintiff cannot recover under 42 U.S.C. § 1983 without establishing a defendant's personal involvement in the alleged constitutional violation.  *See Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010) ("individual liability under § 1983 requires personal involvement in the alleged constitutional violation").

Specifically, plaintiff's retaliation claims against Department of Corrections Secretary Carr will be dismissed.  Nothing in the record indicates that he was ever personally aware of any of the alleged events in this case.  Although his office reviews grievance appeals, Carr has designated that task to his staff, which he is allowed to do.  *See* Wis. Admin. Code § DOC 310.03(16) ("'Secretary' means the secretary of the department or designee.").  There is no evidence Carr ever reviewed any of plaintiff's appeals, and there is no concept of supervisory strict liability under § 1983.  *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011).

Similarly, Warden Buesgen was not personally involved in either the issuance or review of the conduct report or the removal decision.  Rather, defendants Moore, Drost, and Canziani were the supervisors who decided to remove plaintiff from the Veteran's Unit.[5]  Moreover, Deputy Warden Canziani handled plaintiff's conduct report on appeal.  At most, Buesgen adopted Hickey-Wilbur's later recommendation to dismiss plaintiff's renewed inmate complaint based on new evidence allegedly proving that Heath had made

---

[5] Indeed, in his brief in opposition to summary judgment, plaintiff appears to abandon his retaliatory removal claims against all defendants except defendants Moore, Drost, Canziani, and Hickey-Wilbur, stating that "[i]t is clear that the decision to move him was limited to Drost, Canziani, and Moore" but also that Hickey-Wilbur had "influence" and was "involved." (Dkt. #63 at 16.)

a false statement in her conduct report, by noting that he had exhausted his administrative remedies.  (Dkt. #52-2 at 3.)  But merely "[r]uling against a prisoner on an administrative complaint does not cause or contribute to the [underlying] violation." *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007); *see also McGee v. Adams*, 721 F.3d 474, 485 (7th Cir. 2013) (claims against "the individuals who ruled against McGee on the institutional grievances he filed . . . also fail as a matter of law").

As for plaintiff's retaliatory removal claim against defendants Moore and Drost, those are discussed in detail below, but neither were involved in the issuance or approval of the conduct report.  In particular, although Moore is the Security Director, his approval of the conduct report was not required in this case because Officer Heath issued a minor conduct report.  *See* Wis. Admin. Code §§ DOC 303.68, DOC 303.77.  Further, plaintiff conclusorily asserts that Moore knew Heath had lied (dkt. #63 at 13), but offers no evidence to support that assertion.  As for Unit Manager Drost, Heath mentioned to him that she was going to issue plaintiff a conduct report, but Drost did not approve the report or participate in its adjudication, and as noted above, simply being a supervisor is not enough to hold Drost liable for Officer Heath's alleged conduct.  At most, Unit Manager Drost was included on the email chain between Officer Heath, Sergeant Peterlik, and the laundry department.  However, as discussed below, those emails do *not* indicate that Heath was lying about plaintiff's conduct.

Next, plaintiff contends that Kubala, as the supervising officer who adjudicated his conduct report, found plaintiff guilty of those charges in retaliation for his earlier grievances.  Plaintiff's retaliation claim against Kubala based on the conduct report will be

18

addressed below.  However, Kubala was not among the supervisors who removed plaintiff from the Veteran's Unit, so plaintiff cannot hold him liable for that decision.

Finally, defendant Hickey-Wilbur's only involvement was in the grievance process as an inmate complaint examiner.  Specifically, Hickey-Wilbur reviewed and recommended dismissal of plaintiff's inmate complaint alleging that he had newly discovered email evidence proving Heath made false statements against him in her conduct report.  (Dkt. #52-2 at 2.)  As noted above, merely ruling on an inmate's grievance does not establish liability under § 1983, and while plaintiff maintains that he made Hickey-Wilbur aware that Heath had lied, plaintiff did not submit a copy of the email evidence with his inmate complaint.  Regardless, Hickey-Wilbur was not *obligated* to take plaintiff at his word about that evidence or to attempt to locate the evidence herself.  Moreover, she explained to plaintiff that he had already exhausted his administrative remedies with respect to the issue and should pursue a direct review with the Warden.  As for plaintiff's removal from the unit, he simply argues without proof that Hickey-Wilbur "advocated for [him] to be removed from the Veteran's Wing because he was filling inmate complaints" and suggests that she "appears to have influence" over cell assignments.  But plaintiff acknowledges that defendants Drost, Canziani, and Moore made the actual removal decision.  (Dkt. #63 at 16.)  In sum, these unsupported assertions are insufficient to hold Hickey-Wilbur liable for a removal decision made by others, and plaintiff has not been able to raise a genuine dispute of material fact regarding whether Hickey-Wilbur was personally involved in retaliating against him for filing inmate complaints or otherwise failed to handle his complaints properly.

19

## B. Merits

The court now turns to plaintiff's retaliation claims (1) against defendants Heath, Kubala, and Canziani for issuance of the conduct report and (2) against defendants Drost, Moore, and Canziani for the decision to remove plaintiff from the Veteran's Unit.

### 1. Issuance and review of conduct reports

Plaintiff alleges in retaliation for his filing inmate complaints that defendant Heath issued a false conduct report and that defendants Kubala and Canziani retaliated by approving that report despite evidence that Officer Heath lied in the report about plaintiff's conduct.  In response, defendants argue that Heath issued a minor conduct report for legitimate reasons, and the record supports their position.  To begin, the conduct report itself was not threadbare:  Heath quickly emailed Peterlik and the laundry department after the incident to confirm plaintiff's statements and followed up with plaintiff by asking to see his information request.  *Compare Greene*, 660 F.3d at 980 (suspicious timing and "the rather threadbare nature of the [conduct] report" found to be sufficient to create a triable retaliation issue).  Even crediting plaintiff's version of events, he knew from an earlier information request that he had to obey his unit officer regarding departure for the laundry department, and while some officers had allowed workers to leave at a set time, others had the workers wait for permission.  The laundry department officer also confirmed in his email response to Heath that he had told plaintiff it was *up to the unit officer* when he can leave.  Still, plaintiff chose to confront Officer Heath about whether he could leave the unit without her permission, question her decision to verify his statements with his Unit Manager Drost or Sergeant Peterlik, and then left without Heath's permission and without

hearing the call for laundry.

Plaintiff argues that he had to obey Sergeant Peterlik's standing order as the superior officer, a version of which Peterlik confirmed he had given, but plaintiff would have Peterlik's email response to Heath say more than it does. Peterlik only confirms in his email that he told plaintiff to be at the laundry department by a certain time, *not* that plaintiff could leave his unit on his own accord whenever he wanted, much less to disregard another officer's direct order to wait. More to the point, Peterlik's email states that plaintiff should not be leaving before 6:55 a.m., which plaintiff admits he was trying to do when Heath stopped him. Thus, it is undisputed that Heath was the officer in charge in the moment and told plaintiff that he could not leave until she said so.

Giving plaintiff every benefit of the doubt, he may not have heard Heath tell him to sit and wait, he may have left the unit after the call for laundry came in, and he could have been late delivering the laundry because of his disagreement with Heath. However, this suggests no more than some confusion between Officer Heath and plaintiff, and it does not absolve him of trying to leave over Heath's concerns and without her permission, and it certainly does not support a reasonable trier of fact finding that Heath had issued a *false* report based on the information available to her at that time. To the contrary, disregarding a direct order by a correctional officer would normally result in sanctions, and regardless of any other alleged motive, Officer Heath had ample grounds to issue a minor conduct report at the time.

As for defendants Kubala's and Canziani's review of that report, they would have had to have known of facts making Heath's conduct unconstitutional before liability could

21

attach.  *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir. 1999).  In other words, plaintiff must present evidence allowing a reasonable trier of fact to find that these defendants did not honestly believe that Officer Heath's conduct report was valid, but decided to find plaintiff violated DOC rules anyway.  To that end, plaintiff argues that Supervisor Officer Kubala did not give due consideration to Peterlik's email.  However, as just discussed above, that email does not exculpate plaintiff.  Plaintiff also argues that Deputy Warden Canziani should have watched video of the incident showing that plaintiff did not leave the unit until after 6:55 a.m., and therefore did not leave early.  But again, that plaintiff ultimately left after 6:55 a.m. does not necessarily excuse plaintiff from engaging with Officer Heath in the way that he did.  Thus, there was sufficient evidence to support Heath's minor conduct report, and these defendants had no definitive basis to cast doubt on the adjudication process or an obligation to believe plaintiff in every instance.  Furthermore, even if either officer erred in choosing to believe Officer Heath, this does not begin to state a constitutional claim for retaliation.  On the contrary, a federal court is not in the business of second guessing the outcome of a minor conduct report, and plaintiff has offered *nothing* to support a reasonable trier of fact to find that either Supervisory Officer Kubala or Deputy Warden Canziani acted with a retaliatory motive in their review of Officer Heath's conduct report.  Accordingly, defendants' motion for summary judgment on plaintiff's claims of retaliation based on Heath's conduct report will be granted as to all defendants.

### 2. Removal

While at least arguably closer as to Unit Manager Drost, the court will also grant

summary judgment on plaintiff's retaliatory claims based on defendants Drost, Moore, and Canziani removing him from the Veteran's Unit because the record evidence compels a reasonable trier of fact to credit these defendants' stated, legitimate reasons for their decision.  Specifically, there is no dispute that plaintiff filed numerous complaints while living in the unit, which he is allowed to do through the Department of Corrections' inmate grievance system.  These defendants also knew that Officer Heath had advocated for plaintiff's removal in the past as a potential security matter, saying that he was uncomfortably staring at her, keeping notes about her, and targeting her for misconduct.  While plaintiff argues there is no proof that he did anything beyond file legitimate complaints, other inmates also complained that plaintiff was:  (1) targeting staff, including Heath; (2) being disrespectful towards and lying about staff; and (3) pressuring some inmates to also complain about staff.

In response, plaintiff suggests these inmates were lying, and notes his accomplishments while in the Veteran's Unit, which the court does not discount.  Nor does the court discount plaintiff's assertion that some of his complaints resulted in positive change at Stanley.  However, plaintiff does not dispute that Officer Health had advocated his removal from the unit for the reasons stated, nor that other inmates on the unit had registered their own complaints against him.  Indeed, even plaintiff admits talking to other inmates about what he believed was staff misconduct that affected them, as well as encouraging other inmates to join in his complaints.  Thus, plaintiff's positive unit contributions and work evaluations from one officer do not create a genuine dispute with respect to those concerns, nor to Unit Manager Drost's assertions that some other staff felt

23

uncomfortable around plaintiff to the point that they refused to work on the Veteran's Unit to avoid interacting with him, or that plaintiff's own social worker routinely pressed for plaintiff's removal from the unit because of his negative attitude.

Whatever merit there may have been in some of plaintiff's complaints, therefore, a reasonable trier of fact would have to find that defendants Drost, Moore and Canziani had independent reasons to believe that plaintiff was creating a climate problem in a unit meant to give veterans a more supportive environment through his negative interactions with at least some staff and inmates.  Moreover, deference is due to these supervisors' assessments of the various pieces of information they learned supporting plaintiff's removal from the unit.  *See Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) (courts should afford prison officials deference in evaluating proffered legitimate reasons for allegedly retaliatory conduct); *see also Rhodes v. Chapman*, 452 U.S. 337, 349 n.14 (1981) ("a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators").[6] Thus, these claims fail for the same reason as plaintiff's conduct report claims:  the record evidence shows that the removal decision was supported by legitimate, non-retaliatory reasons despite allowing plaintiff some 19 months to adjust to the unit.

---

[6] To shore up his retaliation claims, plaintiff also notes that his removal came the same day he filed an inmate complaint about Officer Heath specifically.  Even so, as here, because "plaintiff has a long pattern of filing complaints . . . it is no surprise that a sanction will be imposed in proximity to a complaint." *Curtis v. Schwartz*, No. 18-cv-1822, 2020 WL 4815805, at *5 (E.D. Wis. Aug. 19, 2020), *aff'd*, 856 F. App'x 44, 2021 WL 1345412 (7th Cir. 2021); *cf. Springer v. Durfling*, 518 F.3d 479, 485 (7th Cir. 2008) (temporal proximity is insufficient to survive a motion for summary judgment).

## II. Plaintiff's State-Law Claims

This leaves only plaintiff's staff-law claims arising from the same set of facts. "The normal practice is to relinquish jurisdiction over a supplemental claim when the claim is dismissed before trial, but if the supplemental claim is easily shown to have no possible merit, dismissing it on the merits is a time saver for everybody." *Korsen v. Local Union 705*, 75 F.3d 285, 288-89 (7th Cir. 1996). In this case, plaintiff admits that he did not strictly comply with Wisconsin's notice-of-claim statute regarding the role played by defendants Hickey-Wilbur, Buesgen, Carr, Kubala, and Moore. (Dkt. #63 at 18.) That statute generally requires a claimant bringing a civil action against a state employee to serve written notice of the claim on Wisconsin's attorney general within 120 days of the event giving rise to the action. Wis. Stat. § 893.82(3). In particular, the notice must include "the names of persons involved." *Id.* Accordingly, the court will also grant the motion for summary judgment as to plaintiff's state-law negligence claims against these defendants for failure to comply with the notice-of-claim statute.

While the parties dispute whether plaintiff's notice of claim is also sufficient as to defendants Canziani and Drost, the court will decline to exercise supplemental jurisdiction over all remaining state-law claims, which are dismissed without prejudice for lack of subject matter jurisdiction. Thus, plaintiff may pursue his state-law claims against defendants Heath, Canziani, and Drost in state court, subject to any applicable statute of limitations.

ORDER

IT IS ORDERED that:

1) Plaintiff Paul Alois Adamski's motion to admit other acts evidence (dkt. #22) is GRANTED in part and DENIED in part.

2) Plaintiff's motion to strike (dkt. #68) is DENIED.

3) Except for plaintiff's state-law claims against defendants Heath, Canziani, and Drost, which are DISMISSED without prejudice, defendants' motion for summary judgment (dkt. #48) is GRANTED.

4) Plaintiff's motion for spoliation sanctions (dkt #18) is DENIED as moot.

5) The clerk of court is directed to enter judgment and close this case.

Entered this 31st day of January, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

26